IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IMX, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 03-1067-SLR |
| | ) |
| LENDINGTREE, LLC, | ) |
| | ) |
| Defendant. | ) |

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of
Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: John Allcock, Esquire, M. Elizabeth Day,
Esquire, William G. Goldman, Esquire, Christine K. Corbett,
Esquire, and Thomas A. Burg, Esquire, of DLA Piper Rudnick Gray
Cary US LLP, East Palo Alto, California.

Jack B. Blumenfeld, Esquire, and Julia Heaney, Esquire, of
Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.
Counsel for Defendant. Of Counsel: Holmes J. Hawkins III,
Esquire, A. Shane Nichols, Esquire, and James J. Mayberry,
Esquire, of King & Spalding LLP, Atlanta, Georgia.

**MEMORANDUM OPINION**

Dated: January _10_ , 2007
Wilmington, Delaware

ROBINSON, /Chief J.

## I. INTRODUCTION

IMX, Inc. ("plaintiff") filed the above-captioned action for infringement of U.S. Patent No. 5,995,947 ("the '947 patent") on November 24, 2003. (D.I. 1) A jury trial on issues of infringement, validity, willfulness, and damages was held from January 11, 2006 through January 20, 2006. A bench trial was also held on defendant's defense and counterclaim that the '947 patent is unenforceable as a result of inequitable conduct. The jury returned a verdict for plaintiff of literal infringement of the '947 patent, against LendingTree LLC ("defendant") on invalidity of the '947 patent, and for plaintiff on willfulness. (D.I. 246)

Currently before the court is defendant's motion for judgment as a matter of law or, in the alternative, for a new trial.[1] (D.I. 263) Also before the court are plaintiff's motions for a permanent injunction (D.I. 260) and for enhanced damages, attorneys' fees and other related expenses and interest (D.I. 264)

## II. BACKGROUND

The '947 patent generally relates to a method and system for

---

[1]Before this case was submitted to the jury, defendant moved for judgment as a matter of law (D.I. 244), which motion was reserved. Defendant filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial, on February 2, 2006 pursuant to Federal Rule of Civil Procedure 50(b). (D.I. 263)

trading loans in real time by making loan applications and placing them up for bid by potential lenders. The '947 patent was originally filed as U.S. Application No. 08/928,559 on September 12, 1997 and was issued on November 30, 1999.

In this case, defendant was accused of infringing claims 1-8, 11-12, 18-27, 30-31, and 38 of the '947 patent. Claims 2-18 depend from claim 1, which reads:[2]

> A method for processing loan applications, said method including steps of maintaining a database of pending loan applications and their statuses at a database server, wherein each party to a loan can search and modify that database consistent with their role in the transaction by requests to said server from a client device identified with their role.

The accused system, the LendingTree Exchange, is an online system designed to connect borrowers to lenders for the purpose of exchanging loan products. The LendingTree Exchange is operated at www.lendingtree.com, wherein potential borrowers complete LendingTree's Qualification Form in furtherance of obtaining a loan.

Prior to trial, the court construed several disputed claim limitations. (D.I. 224) The court construed "loan application"

---

[2]Claims 20-38 depend from claim 19, which reads:
A system for processing loan applications, said system including a database of pending loan applications, said database including status information regarding said pending loan applications; a transaction server, said transaction server being responsive in real time to requests from parties to said pending loan applications, said requests including requests for searching and requests for modifying said database consistent with roles for said parties.

2

to mean "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant or deny the request." (Id.) The court construed "bid" to mean "an offer to make a loan." (Id.) In view of these meanings, the jury found that defendant's LendingTree Exchange literally infringed each of the asserted claims of the '947 patent. (D.I. 246)

## III. STANDARD OF REVIEW

### A. Motion for Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law following a jury trial under Federal Rule of Civil Procedure 50(b), the moving party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'" Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984)). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." Perkin-Elmer Corp., 732 F.2d at 893. In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence

3

presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1348 (3d Cir. 1991); Perkin-Elmer Corp., 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." Id. In summary, the court must determine whether the evidence reasonably supports the jury's verdict. See Dawn Equip. Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998).

**B. Motion for a New Trial**

The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. See Allied Chem. Corp. v. Darflon, Inc., 449 U.S. 33, 36 (1980). Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a

4

miscarriage of justice; (2) where newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. See Zarow-Smith v. N.J. Transit Rail Operations, 953 F. Supp. 581, 584 (D. N.J. 1997) (citations omitted). The court, however, must proceed cautiously and not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's independent evaluation. Nevertheless,

> [w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action.

Lind v. Schenley Indus. Inc., 278 F.2d 79, 90-91 (3d Cir. 1960).

## IV. DISCUSSION

### A. Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial

Defendant alleges that judgment as a matter of law is appropriate on the following issues: (1) defendant cannot infringe any of the asserted claims of the '947 patent because plaintiff has not proven that defendant maintained a database of "loan applications" as required by the claims since defendant's

5

Qualification Forms are not loan applications; (2) defendant
presented uncontradicted evidence that the Mortgage Analysis
Reporting System ("MARS"), prior art under 35 U.S.C. §102(b),
anticipates every asserted claim of the '947 patent; and (3) the
evidence introduced at trial is insufficient to support a finding
of willful infringement. (D.I. 269) Defendant further argues
that, even if there is sufficient evidence to support the jury's
verdict, a new trial is warranted because the verdict is against
the great weight of the evidence. (Id. at 38)

### 1. Timeliness of Defendant's Motion

As a threshold matter, plaintiff claims that, by failing to
move for judgment as a matter of law at the close of plaintiff's
case, defendant waived its argument that plaintiff's evidence was
insufficient. (D.I. 279 at 10-11) Plaintiff reasons in this
regard that it was denied meaningful notice, as contemplated by
Rule 50,³ with respect to issues on which plaintiff had the

---

³Rule 50(b) permits consideration of such renewed motions
for judgment as a matter of law only when a motion for a directed
verdict has been made at the close of the evidence offered by an
opponent. In pertinent part, Rule 50(b) states:

> If, for any reason, the court does not grant a motion
> for judgment as a matter of law made at the close of
> **all the evidence**, the court is considered to have
> submitted the action to the jury subject to the court's
> later deciding the legal questions raised by the
> motion. The movant may renew its request for judgment
> as a matter of law by filing a motion no later than 10
> days after entry of judgment.

(Emphasis added) Similarly, Rule 50(a) requires that "[m]otions
for judgment as a matter of law may be made **at any time before
submission of the case to the jury**." (Emphasis added) This

6

burden of proof (infringement and willfulness). Defendant's motion, therefore, is procedurally improper. (Id.)

Plaintiff asserts that Third Circuit precedent supports its argument that a defendant must move for judgment as a matter of law ("JMOL") at the close of plaintiff's case. (D.I. 279 at 8) In Kutner Buick, Inc. v. American Motors Corp., the Third Circuit stated that "[t]he rule that a post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case is the settled law of this circuit." 868 F.2d 614, 617 (3d Cir. 1989) (collecting cases).[4]

---

requirement to raise the issue before submission to the jury "affords the non-moving party an opportunity to reopen its case and present additional evidence." Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 814 (3d Cir. 1984) (citing Lowenstein v. Pepsi-Cola Bottling Co., 536 F.2d 9, 11 (3d Cir. 1976)).

[4]In Kutner Buick, defendant made a Rule 50 motion at the end of plaintiff's case and again at the end of the case, and the issue was whether "the trial court erred in granting a Rule 50 motion on a ground that was not presented in support of [defendant's] motion" either time it was made. 868 F.2d at 617.

Plaintiff also cites the Lightning Lube, Inc. v. Witco Corp. case in support of its proposition. 4 F.3d 1153, 1172 (3d Cir. 1993). The relevant passage from Lightning Lube states:

The district court did not consider the merits of Witco's foreseeability argument because Witco failed to include this point in either its motion for judgment as a matter of law filed at the close of Lightning Lube's case, or in its renewal of the motion of the close of all of the evidence. In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion.

Id. In Lightning Lube, as in Kutner, the issue was one of non-

More recent Third Circuit authority closely follows the plain language of Rule 50(a), which states that a party can move for JMOL at any time prior to the verdict. See e.g. Greenleaf v. Garlock, Inc., 174 F.3d 352, 364 (3d Cir. 1999) ("It is well settled that a party who does not file a Rule 50 motion for judgment as a matter of law at the end of the evidence is not thereafter entitled to have judgment entered in its favor"); Easter v. Grassi, 51 Fed. Appx. 84, 87 (3d Cir. 2002) (non-precedential) (citing "well established" rule of the Third Circuit that a party must move for JMOL "at the close of all the evidence") (citing Greenleaf, supra).

In the case at bar, defendant rested its case on January 19, 2006. Each party filed Rule 50(a) motions on January 20, 2006. (D.I. 241, 244) Counsel for defendant advised the court on that same date that it would be filing a JMOL in paper form, to which the court responded that "[A]ll your JMOLs are reserved." (D.I. 257 at 1586:6-9) The jury, thereafter, was charged and sent to deliberate.

Plaintiff's argument that defendant's motion is untimely ignores the court's reservation of defendant's motion and is both inconsistent with Third Circuit precedent and with the plain language of Rule 50. The court, therefore, will proceed to

---

disclosure of a specific ground, asserted for the first time post-trial. Id.

8

examine the substance of defendant's motion.

## 2. Literal Infringement

### a. Legal Standard

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a) (2002). A court should employ a two-step analysis in making an infringement determination. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. See id. Construction of the claims is a question of law subject to de novo review. See Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). The trier of fact must then compare the properly construed claims with the accused infringing product. See id. This second step is a question of fact. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs when each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. See Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). The patent owner has the burden of proving literal infringement and must meet its burden by a preponderance of the evidence. See SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988)

9

(citations omitted).

### b. Evidence Before the Jury

The invention at bar is a method for processing loan applications. Defendant asserts that its accused system, the LendingTree Exchange, cannot literally infringe the asserted claims of the '947 patent because defendant does not process "loan applications" as required by the claims. (D.I. 269 at 9-23) The court construed the term "loan application" as used in the claims of the '947 patent to mean "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant or deny the request." (D.I. 224 at 3) The crux of defendant's argument is that there was no evidence presented by plaintiff at trial that the information collected in defendant's Qualification Form ("QF"), without more, is sufficient for a lender to grant or deny a request of an extension of credit. (D.I. 269 at 10; D.I. 284 at 10)

As evidence on the issue of infringement, the jury was presented with defendant's representations about its product: What does defendant do with the information collected online from customers, and how should that conduct be characterized? Plaintiff relied for its analysis on defendant's "public" representations made outside the context of litigation, e.g., in marketing and to the Securities and Exchange Commission ("SEC").

10

In contrast, defendant relied on the explanations offered by its
employees in this litigation.  The most pertinent evidence of
record is discussed below.

### i.  Defendant's Public Representations

Plaintiff introduced at trial documents filed by defendant
with the SEC, wherein defendant declares that consumers "begin
the LendingTree process by completing a simple online credit
request (which we refer to as a 'qualification form')."  (PTX-168
at LT39484)

Defendant's witness, Mr. Douglas Lebda, President and Chief
Operating Officer of defendant's parent company, also confirmed
that defendant's SEC documentation defined the QF as a "credit
request."  (D.I. 254 at 763:11-764:25)  Mr. Lebda stated, without
further explanation, that this statement to the SEC was not
intended to convey that the QF is an actual loan application.
(Id. at 765:1-4)  Mr. Lebda also testified that defendant's SEC
documentation characterizes the first step in the LendingTree
Exchange process as a "credit request," followed by the
communication of an "offer," which is not described as a
conditional offer.  (Id. at 860:23-863:2)

The jury was also presented with evidence that potential
customers are told they will receive "up to four real offers" for
completing defendant's QF.  (e.g., PTX-20; D.I. 254 at 810:11-
811:1)  Mr. Lebda testified that this statement means that

11

customers "can fill out one form and get multiple, real offers. In fact, they are real, from multiple lenders." (Id. at 810:15-17) Further, Mr. Lebda stated that "[w]e want the consumer to know they are getting a real response. This is - the lender has received this information and given you a real response." (Id. at 810:23-811:1)

The jury also saw a video clip of defendant's television commercial, which advertised that consumers "[f]ill out one form and get up to four offers within hours." (D.I. 254 at 831:22-23; PTX-250A) Several examples of defendant's advertising and other public communications which referred to the QF as an application were presented to the jury. (e.g., PTX-61, PTX-40, DTX-56) A videotape of Mr. Lebda's discussion on a conference panel at the University of Virginia was also played for the jury. (PTX-250B) During this presentation, Mr. Lebda stated that defendant "get[s] over 3,000 loan applications every day across all consumer credit categories." (D.I. 254 at 813:14-15) Mr. Lebda explained that, in short television interviews and other public appearances, he could use the term "loan application" to describe the QF in a "generic sense." (Id. at 811:11-16, 811:20-813:1)

### ii. Evidence Tending to Support Defendant's Public Representations

Plaintiff played a portion of the video deposition of John Powell, a Vice President of LendingTree, who was involved with the design of the QF. Mr. Powell testified that the QF is not a

12

full loan application, but contains the "basic parameters
necessary in order to render a decision." (D.I. 252 at 371:19-
373:23)  Stated another way, the QF was designed to "collect the
fields that are necessary in order to render a decision."  (Id.
at 373:22-23)  Defendant asserts that the only "decisions"
enabled by the information in the QF are "decisions about whether
a consumer may prequalify for a loan," resulting in only
"conditional offers reflecting that the consumer may prequalify
for a loan." (D.I. 269 at 19)

Plaintiff also introduced the testimony of Warren Myer,
proprietor of Myer's Internet, a company which provides internet
technology to mortgage brokers through over 5,000 mortgage broker
websites.  (D.I. 252 at 306:25-307:18)  Mr. Myer believes that he
designed the first on-line loan application in the United States.
(Id. at 309:12-13)  Mr. Myer testified that the LendingTree QF
contains "all of the information required for a lender to make a
loan decision."  (D.I. 252 at 323:13-14)  Mr. Myer discussed and
illustrated many similarities between the QF and a universal
residential loan application, and concluded that "effectively the
same information is obtained" through each form.  (Id. at 323:13-
337:9, 362:4-11)

Plaintiff also introduced the testimony of its technical
expert, Dr. Martin Kaliski, whose area of expertise is computer

13

systems and software.[5]  Dr. Kaliski testified that the QF
provides sufficiently detailed information to enable a lender to
grant or deny a request for credit.  (D.I. 252 at 397:9-13)  Dr.
Kaliski further testified that the LendingTree Exchange system
described in defendant's documents contains the same concepts as
in the asserted claims of the '947 patent.  (Id. at 432:21-24)
Dr. Kaliski stated that his conclusion is aided by statements in
defendant's SEC documentation which describe the QF as a credit
request.  (Id. at 408:18-409:13, 411:6-412:9)  Dr. Kaliski
testified that he believes these statements are accurate because
defendant's SEC documentation was signed by the CEO of
LendingTree before it was submitted to the government.  (Id.)
Dr. Kaliski testified that the LendingTree exchange system
described in defendant's documents contains the same concepts as
in the asserted claims of the '947 patent.  (Id. at 432:21-24)

### iii.  Defendant's Litigation Position

At trial, defendant argued that the QF is not a loan
application because it collects less information than is required

---

[5]Defendant asserts that plaintiff can not rely on Dr.
Kaliski's testimony because he was not tendered as an expert in
the field of loans or mortgages, only computer database systems.
(D.I. 269 at 21)  The jury was aware of Dr. Kaliski's background,
and he was cross-examined on this very issue.  (D.I. 252 at
377:15-18; D.I. 253 at 523:21-524:16, 527:7-10)  Viewing the
record in the light most favorable to plaintiff, the jury could
have discounted Dr. Kaliski's testimony based upon his
qualifications during their consideration of all of the evidence,
but, as their verdict indicates, may have elected not to.

14

to enable a lender to make a credit decision.  In support of this
argument, Mr. Lebda testified that the QF collects less
information than a full loan application and that the QF is
actually a lead form and not a loan application.  (D.I. 254 at
736:22-737:8)  Mr. Lebda further testified that, according to
defendants' 1997 business plan, customers were explicitly
notified that the QF was not a loan application.  (Id. at 754:25-
755:25)

Defendant also introduced the testimony of Alexandra Shin,
Senior Vice President of Marketing at LendingTree Loan, who
identified several pieces of information missing from the QF.[6]
Of these, Ms. Shin identified several types of information
missing from the QF which would be required or necessary for a
lender to make a credit decision, namely:  (1) the street address
for the property to be mortgaged; (2) the borrower's credit
score; and (3) a three-bureau merged credit report.  (D.I. 255 at
1070:13-1071:8; D.I. 254 at 987:2-4)

Similarly, defendant's expert in the field of mortgage
technology, Scott Cooley, testified that "the amount of

---

[6]Ms. Shin testified that the QF lacked complete asset,
income, credit, employment, monthly housing expense, and
liability information, as well as a schedule of real estate
owned.  (D.I. 254 at 984:2-24; D.I. 255 at 1023:11-20 (number of
jobs and duration of employment are missing); id. at 1024:3-12
(monthly income provided on the qualification form is not "down
to the level of detail that lenders need"); id. at 1025:6-1027:15
("important" factors such as types of debt and income and real
estate owned are not present))

15

information that the QF collects is just a tiny portion of the
information that's needed on the - on a loan application." (D.I.
255 at 1066:22-24) Mr. Cooley identified information missing
from the QF which was necessary to a credit determination, such
as: (1) what type of loan is being sought; (2) the street
address of the property; (3) borrower's previous employment; (4)
detailed income information (rather than total income); and (5)
detailed debt information (rather than total liabilities). (D.I.
255 at 1069:14-23, 1070:8-1071:7, 1072:17-1073:1, 1073:12-21,
1076:3-1077:6)

Defendant argues that its evidence regarding the (missing)
content of the QF was unrefuted; however, this is not necessarily
the case. (D.I. 269 at 22-23; D.I. 284 at 10-11) According to
Ms. Shin, consumers know a credit report will be obtained at the
beginning of the process. (D.I. 255 at 1043:2-5) Mr. Myer
testified that lenders can make "conditional approvals" without
the actual property address of the home that is going to be
mortgaged. (D.I. 252 at 363:12-19)

With respect to the testimony of Mr. Powell and Mr. Myer,
defendant asserts that the only "decisions" enabled by the
information in the QF are "decisions about whether a consumer may
prequalify for a loan," resulting in only "conditional offers
reflecting that the consumer may prequalify for a loan." (D.I.
269 at 19) Throughout its briefing, defendant argues that

16

conditional offers are decisions "to further negotiate a possible extension of credit, *not* a decision to grant or deny credit." (D.I. 284 at 7 (collecting testimony that conditional offers are extended)) Defendant's argument is supported by statements in defendant's public "Help Center" webpage.[7] (DTX-136)

## c. Discussion

The evidence presented demonstrates that there are distinct inconsistences between defendant's public characterizations of the QF and the LendingTree Exchange made in its public advertising and to the SEC, and defendant's characterizations of the QF and the LendingTree Exchange in its less conspicuous "Disclosures" webpage and in the context of trial. Given that there is no "science" involved, this case, more so than others, ultimately revolves around the reliability of the evidence presented. By returning a verdict in favor of plaintiff, the

---

[7]The evidence presented tends to indicate that defendant's "Help Center" webpage contains links to additional webpages containing information on several subtopics. (DTX-136; D.I. 251 at 138:20-23) Defendant's "Licensing and Disclosures" page, under a heading entitled "What is Lending Tree?," includes the following statement in the second paragraph under that heading:
> The loan request you submit is NOT an application for credit. Rather, it is a request for a loan pre-qualification. You **may** have to complete an application with a Lender before they will extend an unconditional loan offer.

(DTX-136) (emphasis added) Though defendant's webpage is publicly available, this statement is less accessible than defendant's public advertising. Additionally, the statement is not unequivocal regarding whether an unconditional loan offer could result from the information provided in the QF.

17

jury apparently concluded that defendant's public representations (regarding the functionality and effect of the QF and the LendingTree Exchange process) were more reliable.  The court will not substitute its own resolution of the conflicting evidence for that of the jury.  See Applied Medical Resources Corp. v. U.S. Surgical Corp., 147 F.3d 1374, 1377 (Fed. Cir. 1988).

Further, it appears that the jury weighed the testimony and found the testimony of Mr. Myer more convincing than that of Mr. Powell, Mr. Lebda, and/or Ms. Shin - all of whom are associated with LendingTree or related companies.  Mr. Myer did admit during cross-examination that the offers provided by lenders to consumers through the Lending Tree website are not actual loan commitments.  (D.I. 252 at 357:20-24)  Notwithstanding, and viewing the record in a light most favorable to plaintiff, it appears that the jury could have reasonably concluded that, even if lenders do not actually extend credit upon receipt of the QF, the QF may nonetheless be "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant or deny the request."[8]  As could be expected, the testimony of Dr. Kaliski and Mr. Cooley was directly antithetical on this point.  The jury ultimately agreed with Dr. Kaliski and/or Mr. Myer, and the court does not disturb

---

[8]The court adopted defendant's proposed construction of this claim limitation, with minor modification.  (D.I. 162, 224)

18

its credibility determination. See Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891) ("There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury is to be guided in determining the weight and credibility of his testimony. That part of every case . . . belongs to the jury . . . [S]o long as we have jury trials they should not be disturbed in their possession of it").

For the aforementioned reasons, the court denies defendant's motion for judgment as a matter of law with respect to literal infringement.[9] The record demonstrates that plaintiff presented sufficient evidence to carry its burden to prove infringement by a preponderance of the evidence and that defendant did not present evidence that so overwhelmingly favored its position that the jury clearly erred in finding that the LendingTree Exchange literally infringes the '947 patent.[10] The court concludes that

---

[9]The jury did not render a verdict as to infringement under the doctrine of equivalents and the court declines to render judgment on this issue as a matter of law under Rule 50(b)(2).

[10]The court's construction of "loan application" includes "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant **or deny** the request." (D.I. 224) There is no evidence of record that a borrower who does not receive a "conditional offer" can thereafter "negotiate" or provide additional information to later receive an offer, whether conditional or not. This suggests finality in the process, even if the borrower is automatically screened-out by a lender's automatic computer program filters. (D.I. 255 at 1032:22-1033:13) While defendant's argument suggests that a borrower can only get a "conditional offer" which

19

the jury's verdict is not against the great weight of the
evidence and will not result in a miscarriage of justice.   The
court declines to grant a new trial on these grounds.

### 3.  Validity

#### a.  Legal Standard

A patent is presumed valid and the burden of proving
invalidity, whether under § 112 or otherwise, rests with the
challenger.  See 35 U.S.C. § 282.  In order to overcome this
presumption, the party challenging validity bears the burden of
proving, by clear and convincing evidence, that the invention
fails to meet the requirements of patentability.  See Hewlett-
Packard Co. v. Bausch & Lomb, 909 F.2d 1464, 1467 (Fed. Cir.
1990).  Clear and convincing evidence is evidence that "could
place in the ultimate factfinder an abiding conviction that the
truth of [the] factual contentions [is] 'highly probable.'"
Colorado v. New Mexico, 467 U.S. 310, 316 (1984).

Corroboration of a witness' oral testimony is required to
invalidate a patent under 35 U.S.C. § 102.  See Finnigan Corp. v.
International Trade Comm'n, 180 F.3d 1354, 1367 (Fed. Cir. 1999).
This requirement exists regardless of whether the witness is an
interested party or an uninterested party.  See id. at 1367-68.

_____

is not sufficient to enable a lender to grant a request for
credit using information supplied in the QF alone, defendant
ignores the possibility that the information contained in the QF
is sufficient to result in a denial of such a request, insofar as
getting no offers is the equivalent of a denial.

Corroboration has been required by the courts "because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." Id. at 1368.

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States."[11] A claim is anticipated only if each and every limitation as set forth in the claim is found, either expressly or inherently described, in a single prior art reference. Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631 (Fed. Cir. 1987); Scripps, 927 F.2d at 1576 ("There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention.").

### b. Discussion

---

[11]Anticipation is also recognized under 35 U.S.C. § 102(e). As that subsection states,

> [a] person shall be entitled to a patent unless the invention was described in an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent . . . or a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent.

35 U.S.C. § 102(e).

Defendant argues that the '947 patent is invalid as anticipated by the prior public use of the Mortgage Analysis Reporting System ("MARS") more than a year before the filing date. (D.I. 269 at 24-33) Defendant offered the testimony of Allan Redstone on invalidity, who is the founder and president of a company called GHR Systems and who, himself, developed MARS.

Defendant asserts that the jury's verdict was in error because Mr. Redstone testified that the MARS system embodied each limitation of the asserted claims, Mr. Redstone's testimony was corroborated by documentary evidence, and plaintiff did not introduce any evidence that contradicted or refuted Mr. Redstone's testimony. (D.I. 269 at 26-31)

Plaintiff contends that defendant failed to present corroborating evidence that each limitation of the asserted '947 patent claims was present in MARS. Specifically, with respect to the independent claims, plaintiff argues that Mr. Redstone failed to present corroborating evidence that: (1) the MARS system stored status information about loan applications in a database of pending loan applications; (2) the MARS system operated in real time;[12] and that (3) both lenders and borrowers could search the MARS database in accordance with their roles in the transaction. (D.I. 279 at 33-34)

---

[12]Claim 19 of the '947 patent requires that the method operate in "real time," however Claim 1 does not.

22

Claim 1 of the '947 patent requires that the database is capable of being searched and modified by "each party to a loan" consistent with their role in the transaction. Mr. Redstone testified that brokers or lenders could search the MARS database. (Id. at 914:10-916:25) Mr. Redstone did not testify regarding whether borrowers could do the same. Mr. Redstone also testified that lenders "modified" the MARS database by transferring information from the lender's processing system to the database but, again, no such testimony was presented regarding the borrowers. (Id. at 917:8-919:12) Defendant did not identify any such testimony in its briefing. Therefore, it does not appear that the MARS system contained each of the limitations of the claims so as to anticipate those claims. See Verdegaal Bros., Inc., 814 F.2d at 631 (all limitations of the claims must be embodied by an anticipatory prior art reference).

Even assuming that all of the claim limitations were present in MARS – an assumption not justified by the present record – Mr. Redstone did not present evidence that a reasonable juror could view as clear and convincing evidence "that MARS was made, used, and sold publicly more than a year before the priority date." (D.I. 269 at 25)

Using GHR's 1993 Business Plan, Mr. Redstone testified that Sears Mortgage Company, GMAC Mortgage, and G.E. Capital Mortgage Services had obtained MARS from GHR and were using MARS prior to

23

September 1996. (DTX-110, D.I. 254 at 889:21-890:1) On cross-examination, Mr. Redstone backtracked from his testimony regarding the prior use of the MARS system. Mr Redstone admitted that there was no evidence that conclusively proved that the MARS system was being used by Sears Mortgage Company, GMAC Mortgage, and/or G.E. Capital Mortgage Services prior to the priority date:

> Q. Now, you don't have any evidence that those companies actually used [the MARS] system, do you?
> A. I don't know whether we, what kind of detailed documentation we provided, but we've got contracts and so forth, you know.
> Q. Well, we have not seen any of that information here today; is that right?
> A. No, not that I am aware of, no.

(D.I. 254 at 957:13-20)

Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy. Minn. Min. & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002) (citing Netscape Comm. Corp. v. Konrad, 295 F.3d 1315, 1321 (Fed. Cir. 2002)). At trial, Mr. Redstone could not identify any instance in which MARS documentation was provided to a customer without a nondisclosure agreement.[13] (D.I. 254 at 957:23-958:15)

---

[13]"The presence or absence of a confidentiality agreement is not dispositive of the public use issue, but is one factor to be considered in assessing all the evidence." Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1379 (Fed. Cir. 2004) (quoting Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1266 (Fed. Cir. 1986) (internal quotations omitted)); see also Kinzenbaw v. Deere & Co., 741 F.2d 383, 390 (Fed. Cir. 1984) ("While secrecy is one factor to be considered in determining

24

Mr. Redstone also admitted that there was no evidence introduced at trial that MARS was ever displayed at a trade show or described in a public forum.  (Id. at 958:15-25)

Viewing the record in a light most favorable to plaintiff, it appears that the jury could have reasonably concluded that defendant's evidence of prior public use did not rise to the level of clear and convincing evidence.  On its face, the 1993 Business Plan was, as per its title, only a "plan" for events which may or may not have actually taken place, and upon which Mr. Redstone's testimony shed no light.

For the aforementioned reasons, the court concludes that the jury's verdict was not in error as a matter of law, and that there was sufficient evidence of record from which the jury could have reasonably found that the '947 patent was not invalid.[14]

---

whether the use was experimental or public, secrecy alone does not necessarily negate public use.") (citations omitted).

[14]Defendant argues that plaintiff only contested Mr. Redstone's testimony via cross-examination, which is insufficient to counter defendant's prima facie case under the decision in ArthroCare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365 (Fed. Cir. 2005).  (D.I. 269 at 33)  This argument need not be addressed in light of the court's finding that defendant did not present a prima facie case because (1) defendant did not present evidence that each limitation of the asserted claims of the '947 patent was embodied in MARS, and (2) defendant did not present evidence upon which a jury reasonably could conclude that MARS was publicly used prior to the priority date.  Further, the burden to prove invalidity by clear and convincing evidence rested with defendant.  Defendant's argument that the jury's verdict was against the great weight of the evidence insofar as plaintiff elected not to present a rebuttal witness is without merit.

25

The court thus denies defendant's motion for judgment as a matter of law with respect to validity. In view of the foregoing, the court further finds that the jury's verdict is not against the great weight of the evidence or that a miscarriage of justice will result if the jury's verdict stands. The court declines to grant a new trial on these grounds.

## 4. Willfulness, Enhanced Damages, Attorneys Fees and Other Costs

### a. Willful Infringement

Defendant requests that the court find, as a matter of law, that its infringement was not willful, even if the court concludes that the verdicts on infringement and validity should stand. (D.I. 269 at 33) Defendant asserts that "[t]here is no evidence in the record that LendingTree acted in disregard of the '947 without a reasonable basis for believing it had a right to operate the LendingTree Exchange." (Id. at 34)

### i. Legal standard

"Fundamental to determination of willful infringement is the duty to act in accordance with law." Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1343 (Fed. Cir. 2004). Accordingly, "[a] jury verdict of willfulness requires a finding by clear and convincing evidence in view of the totality of the circumstances that the defendant acted in disregard of the patent and lacked a reasonable basis for believing it had a right to do what it did." nCube Corp. v.

26

Seachange Intern., Inc., 436 F.3d 1317, 1319 (Fed. Cir. 2006)
(citing Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d
178, 181 (Fed. Cir. 1994)). "Willfulness in infringement, as in
life, is not an all-or-nothing trait, but one of degree. It
recognizes that infringement may range from unknowing, or
accidental, to deliberate, or reckless, disregard of a patentee's
legal rights." Knorr-Bremse, 383 F.3d at 1343 (citing Rite-Hite
Corp. v. Kelley Co., 819 F.2d 1120, 1125-26 (Fed. Cir. 1987)).
It is plaintiff's burden to prove willful infringement by clear
and convincing evidence. Comark Comm's, Inc. v. Harris Corp.,
156 F.3d 1182, 1190 (Fed. Cir. 1998).

## ii. Evidence before the jury

The jury in this case had before it several facts from which
to evaluate the totality of the circumstances surrounding
willfulness. Mr. Lebda testified that he became aware of the
'947 patent on or about January 25, 2000 through a press release
issued by plaintiff. (D.I. 254 at 77:25-778:14; 842:18-843:9)
At that time, Mr. Lebda appreciated that the '947 patent related
to a system with "real time" and search capabilities. (Id. at
843:18-845:3) Mr. Lebda forwarded the press release to
defendant's general counsel, because defendant was prosecuting
its own patents and was "required to alert the Patent Office of
any potentially related patents." (Id. at 779:3-18) Mr. Lebda
also testified that defendant has made no changes in defendant's

27

business or its LendingTree Exchange, notwithstanding its knowledge of the '947 patent or plaintiff's filing of the present suit. (Id. at 772:5-11)

The current lawsuit was initiated in November 2003. Thereafter, defendant obtained a legal opinion on the validity of the '947 patent:

> [B]y that winter of 2004, we decided to go hire a firm and our general counsel went through a process of trying to find the right firm. We really wanted to make sure that we got the right firm and the right partner at the right firm to give us a - to give us the right answer and to tell us factually whether this ['947 patent] was a valid patent.

(Id. at 795:4-11) Defendant retained, in May of 2004, the law firm of Kenyon & Kenyon to complete an opinion on validity. (Id. Id. at 795:25-796:3) The opinion issued in November of 2004, and concluded that the '947 patent was invalid due to anticipation by, and the prior public use of, the MARS system. (Id. at 796:4-798:21, 799:5-8) Mr. Lebda only skimmed the invalidity opinion. (Id. at 854:14-22) Mr. Lebda explained that he likely "reviewed the opinion with [] in-house counsel." (Id.) Defendant never obtained a legal opinion regarding infringement.[15] (D.I. 269 at

---

[15]Mr. Lebda insinuated at trial that in-house counsel gave an opinion of non-infringement. Mr. Lenda indicated that defendant was "very well poised within [its] own legal department to figure out whether [it] infringed or not and obviously believed we weren't infringing the patent. But when it came to invalidity, we knew that that required lots of research from third-party sources and going through the Patent Office and all of those prosecution histories. And so we felt it was important to get a second opinion, if you will, on the validity of the patent." (D.I. 254 at 794:15-23) The record contains no details

28

37)

### iii.  Discussion

Defendant argues that the fact that it never sought an opinion of counsel on infringement is insufficient to support a finding of willfulness in the totality of the circumstances.[16] (Id. at 37)  Defendant's lack of an opinion of counsel of noninfringement is only one of several facts of record which, in their totality, appear to support the jury's finding of willfulness.

Defendant had knowledge of the '947 patent in 2000, yet took no action and obtained no opinion on the '947 patent until 2004. Further, when defendant was eventually sued in November 2003, it allowed six months to elapse after suit had been filed before it hired Kenyon & Kenyon to complete an invalidity opinion.

Plaintiff established all of these facts at trial which, in their totality, support the jury's finding that defendant did not form a reasonable belief that it did not infringe or the '947 patent was invalid so as to abdicate its duty to avoid infringement.  The court finds this evidence sufficient to support the jury's finding of willfulness under the clear and

---

regarding any opinion of defendant's in-house counsel.

[16]Defendant does not contest that the jury received a proper jury instruction that no negative inference may be drawn from defendant's failure to obtain an opinion on infringement.  (D.I. 269 at 36-37)

29

convincing standard and, therefore, denies defendant's motion for judgment as a matter of law with respect to willfulness. For the same reasons, the court also declines to grant a new trial on this issue.

### b. Enhanced Damages

Plaintiff seeks enhanced damages for defendant's willful infringement of the '947 patent. Pursuant to 35 U.S.C. § 284, a court may, in its discretion, "increase the damages up to three times the amount found or assessed." Where the fact-finder has determined that "an infringer is guilty of conduct upon which enhanced damages may be based, the court next determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996). As the Federal Circuit has explained:

The principal considerations in enhancement of damages are the same as those of the willfulness determination, but in greater nuance as may affect the degree of enhancement. Thus egregiousness of the infringer's conduct may receive greater emphasis, as may any mitigating factors.

SRI Intern., Inc. v. Advanced Technology Laboratories, Inc., 127 F.3d 1462, 1469 (Fed. Cir. 1997) (citing Read Corp., 970 F.2d at 826-27).

Factors the court may take into consideration when determining whether, and to what extent, to exercise its discretion include: (1) whether the infringer deliberately

30

copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1352 n.16 (Fed. Cir. 1998) (citing Read Corp., 970 F.2d at 827). The Federal Circuit has also condoned the enhancement of damages based upon the improper conduct of parties. See Amstead Industries Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 184 (Fed. Cir. 1994) ("The decision whether to increase damages "provides an opportunity for the trial court to balance equitable concerns as it determines whether and how to recompense the successful litigant.") (internal quotation and citation omitted).

The ultimate question remains, however, "whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing." SRI Int'l, 127 F.3d at 1464-65.

### i. Defendant's purported wasteful and improper behavior in litigation

Plaintiff asserts that enhanced damages are warranted based

31

upon defendant's improper behavior in this litigation, specifically, defendant: (1) advanced a meritless inequitable conduct defense; (2) refused to identify the specific prior art references upon which it sought to rely at trial until ordered to do so by this court; and (3) pursued an unsubstantiated and ambiguous obviousness defense throughout the case.[17]  (D.I. 283 at 10-11)

Defendant's obviousness defense was poorly organized and executed and, as a consequence, was ultimately unsuccessful. By a separate opinion of the same date, the court has found defendant's inequitable conduct arguments unconvincing. Inequitable conduct arguments are frequently made, yet rarely successful. See Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988). Nevertheless, the court finds nothing in the record which demonstrates that either of defendant's attempts to avoid infringement were profligate or indicative of improper litigation conduct. Defendant's failure to timely identify prior art references pursuant to 35 U.S.C. § 282 was brought to the court's attention at the pretrial conference. Though not necessarily exemplary litigation conduct, the court rectified defendant's noncompliance at that time.

---

[17]Plaintiff also argues that defendant's improper litigation conduct is evidenced by defendant's reliance on legal arguments which have been rejected by the Federal Circuit in its post-trial briefing, and defendant's belated reliance on a second opinion of counsel in its post-trial briefing.  (D.I. 283 at 11-12)

Having presided over this case throughout discovery and trial,[18] the court does not find that defendant's behavior throughout this litigation was egregious so as to favor the award of enhanced damages. This factor is neutral.

### ii.  Defendant's duty to avoid infringement

Plaintiff asserts that defendant had no sound reason to believe that the '947 patent was either invalid or not infringed between 2000, when Mr. Lebda learned of the '947 patent, and 2004, when defendant obtained an invalidity opinion from Kenyon & Kenyon.  (D.I. 272 at 3-5)  Plaintiff further asserts that defendant could not have relied upon the 2004 invalidity opinion in good faith, because the letter was not obtained promptly after defendant learned of the '947 patent and because Mr. Lebda did not read the opinion once it was obtained.  (Id. at 4-5)

There is no dispute that defendant had actual notice of the '947 patent in January of 2000.[19]  See Imonex Svcs., Inc. v. W.H.

---

[18]As defendant notes, the court previously stated that parties put on "a very well tried case" and spoke appreciatively of the "professionalism that [the parties] all brought to the courtroom."  (D.I. 276 at 17 (citing D.I. 257 at 1716:21-23))

[19]Contrary to defendant's assertion, the court did not previously rule that defendant had no constructive or actual notice of its infringement of the '947 patent prior to plaintiff's filing suit.  (D.I. 276 at 14-15)  Rather, the court ruled that plaintiff was not entitled to pre-litigation damages because plaintiff did not comply with its duty to mark its IMX Exchange system.  (D.I. 225 at 9-11)  This fact has absolutely no bearing on whether defendant had notice of the '947 patent and thereafter complied with its duty to avoid infringement.

Defendant also asserts that it had no reason to believe that

33

Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1377 (Fed. Cir.
2005) ("Actual notice of another's patent rights triggers an
affirmative duty of due care") (citation omitted). As discussed
previously, there is no evidence of record that defendant took
any affirmative actions between 2000 and May 2004, when it hired
Kenyon & Kenyon six months after the present suit had been filed.
Defendant asserts that the six-month lapse demonstrates that
defendant "embarked on a lengthy and detailed search for
appropriate patent counsel" and "exercise[d] care in choosing
patent counsel." (D.I. 276 at 16-17)

### iii. Closeness of the case

Plaintiff argues that the closeness of this case is
evidenced by the jury's quick verdict (within a single day of
deliberation). (D.I. 283 at 12) The caselaw, however, indicates
that the length of deliberations can not be taken into account
either way in assessing the closeness of the case. See Floe
Intern., Inc. v. Newmans' Mfg. Inc., No. Civ. A. 04-5120, 2006 WL
2472112, *5 (D. Minn. Aug. 23, 2006) ("The Court rejects Newmans'
assertion that the fact that the jury deliberated for two days

---

the '947 patent had any relevance to its activities because
plaintiff never mentioned the '947 patent to defendant or
iterated any concerns over defendant's infringement prior to
filing suit. (D.I. 276 at 16) Defendant's argument again misses
the mark. That defendant did not learn of its potential
infringement from plaintiff has no bearing on whether defendant
had a sufficient basis from which to believe, in good faith, that
it complied with its affirmative duty of due care.

means that the case was close. The length of jury deliberations generally does not indicate whether a case is close or not."); Odetics, Inc. v. Storage Technology Corp., 14 F.Supp.2d 800, 804 n.7 (E.D.Va. 1998) ("[Plaintiff] suggests that the fact that the jury deliberated for only three or four hours somehow indicates that the case was not a close one. This is not necessarily so; the jury could have found the case very close, but also could have decided in relatively quick time that the evidence tipped, ever so slightly, in [plaintiff's] favor. Therefore, no confident inference can be drawn from the length of the jury's deliberations.").[20] Further, the court has noted that the question of defendant's infringement of the '947 patent appears to have been a "close" one on the facts of record, which would mitigate against any finding that enhanced damages are appropriate.

### iv. Remedial action

Plaintiff argues that defendant has taken no remedial action and has announced its intention to continue its business practices. (D.I. 283 at 13-15) There is no dispute that defendant has not changed its business practices since the time

---

[20]In contrast, plaintiff's cited authority does not stand for the proposition that the length of a jury's deliberation is indicative of the closeness of the case. (D.I. 283 at 12, citing Juicy Whip, Inc. v. Orange Bang, 382 F.3d 1367, 1373 (Fed. Cir. 2004), noting defendant pointed out the length of deliberations, but not subscribing any particular significance to this argument in concluding that district court did not abuse its discretion))

it learned of the '947 patent and has taken no remedial action following the jury's verdict.[21]

## v. Defendant's financial condition

Defendant generated $190 million in revenues in 2004 alone, and employs over 1500 people. (D.I. 251 at 132:13-133:5; D.I. 254 at 761:19) It appears that defendant is a large company and in good financial condition sufficient that defendant would not be materially impacted by an enhanced damages verdict. See Black & Decker Inc. v. Robert Bosch Tool Corp., No. Civ. A. 04-7955, 2006 WL 3359349, *9 (N.D. Ill. Nov. 20, 2006) ("Bosch is a large corporation with millions of dollars in sales each year. As such, Bosch's size and financial condition suggest that enhanced damages would not significantly jeopardize Bosch's financial well-being."); Third Wave Technologies, Inc. v. Stratagene Corp., 405 F.Supp.2d 991, 1017 (W.D. Wis. 2005) (holding that "[n]either defendant's size not its financial condition mitigates [sic] against an award of enhanced damages" where defendant had 467 employees and over $84 million in gross income in one fiscal year); nCUBE Corp. v. SeaChange Intern., Inc., 313 F.Supp.2d 361,

---

[21]Plaintiff claims that the CEO of defendant's parent company "expressed disregard for the jury's verdict" and expressed an "intention to continue its willful and wanton infringement," by stating that "consumers will continue to use the LendingTree marketplace to find lenders that will compete for their business." (Id. at 14 (citing D.I. 274, ex. A)) The court does not view this general statement as indicative of a flagrant disregard of the jury's verdict.

36

390 (D. Del. 2004) (holding that financial condition factor
weighted in favor of enhancing damages where defendant had over
$92 million in cash holdings, total assets exceeding $150
million, and generated over $31 million in sales of its
infringing system).

### vi. Lack of copying

Mr. Lebda testified that he conceived of the LendingTree
Exchange in 1995, without the assistance of anyone at IMX.  (D.I.
254 at 721:21-722:7)  The application which issued as the '947
patent was filed in September of 1997.  There is no evidence of
deliberate copying of record.

### vii. Discussion

Only three of the Read factors seem to suggest that enhanced
damages may be appropriate in this case:  (1) defendant did not
investigate the scope of the '947 patent and form a good faith
belief of invalidity or noninfringement between 2000 and 2004,
which is the principal consideration for willfulness; (2)
defendant undertook no remedial action; and (3) defendant's
financial condition is such that defendant would not be
jeopardized by an enhanced damages award.  Defendant's behavior
as a party to this litigation was not egregious.  On the other
hand, the infringement case was close, and defendant did not copy
the invention of the '947 patent.

There is no evidence that defendant has ever attempted to

37

conceal its infringement. In fact, defendant has never changed its course of conduct with respect to its operation of the LendingTree Exchange. Defendant learned of the '947 patent in 2000, yet did nothing. Defendant was sued in 2003 yet, still, took no action until 2004, when it received an invalidity opinion based solely on anticipation by, and the prior public use of, the MARS system – a defense which was largely unsubstantiated by Mr. Redstone at trial. (D.I. 254 at 796:4-798:21) The jury in this case concluded, on January 23, 2006, that the '947 patent is valid and that defendant's LendingTree Exchange infringes the '947 patent. (D.I. 246) Since that time, defendant has done nothing to alter the operation of its infringing system.

Defendant's attitude regarding its trespass on plaintiff's rights is not justified by the fact that the question of infringement was arguably close in this case. As an initial matter, plaintiff needed only to demonstrate that defendant infringed the '947 patent by a preponderance of the evidence; this burden was comfortably met on the facts of record. Secondly, defendant had no ascertainable basis from which to believe it did not infringe the '947 patent.

Considering the totality of the circumstances in this case, the court finds that the balance is tipped in favor of enhancing damages. The court concludes that the jury's award of actual damages, plus fifty percent is appropriate under these

38

circumstances.  See Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1328-29 (Fed. Cir. 1987) (affirming district court's award of the doubling of damages for "willful and conscious disregard" of plaintiff's patent rights, where defendant did not procure a patent search prior to suit and where defendant continued to manufacture and sell infringing devices, despite receiving an exculpatory opinion of counsel after suit had been filed); American Medical Sys., Inc. v. Medical Engineering Corp., 794 F.Supp. 1370, 1396-98 (E.D. Wis. 1992) (increasing damages award by fifty percent where evidence regarding the foundation of defendant's pre-suit oral opinion of counsel was lacking, defendant's written exculpatory opinion of counsel was obtained 20 months after infringement began, and where defendant deliberately copied the patented invention), aff'd in part and vacated in part on other grounds, 6 F.3d 1523, 1532 (Fed. Cir. 1993) ("it is apparent that the district court took into account mitigating factors in determining the degree of willfulness, because it chose to award enhanced damages of only 1.5 times the total amount rather than awarding the maximum treble damages allowable").

### c.  Attorneys' Fees and Costs

Plaintiff argues that defendant's willful infringement, defendant's lack of a good faith belief that it did not infringe, and defendant's litigation tactics, discussed supra, support a

finding that this case is exceptional pursuant to 35 U.S.C. §
285.[22]  (D.I. 272 at 11-13)  In deciding whether to award
attorneys' fees, the court must undertake a two-step inquiry.
See Interspiro USA, Inc. v. Figgie Intern. Inc., 18 F.3d 927, 933
(Fed. Cir. 1994).  First, the court "must determine whether there
is clear and convincing evidence that the case is 'exceptional.'"
Id.  Second, the court must determine whether "an award of
attorney fees to the prevailing party is warranted."  Id.
Exceptional cases include: "[i]nequitable conduct before the PTO;
litigation misconduct; vexatious, unjustified, and otherwise bad
faith litigation; a frivolous suit or willful infringement."
Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022,
1034 (Fed. Cir. 2002).

    As discussed previously, defendant's infringement of the
'947 patent was a "close" question, and defendant's trial tactics
did not rise to the level of bad faith or vexatious litigation.
The court concludes, therefore, that this case is not
exceptional.  Accordingly, plaintiff's motion for attorneys' fees
shall be denied.

## B.  Permanent Injunction

### 1.  Background and Standards

---

[22]In the alternative, plaintiff seeks that the court utilize
its equitable power to award fees to plaintiff, given that "it
would be grossly unfair if IMX did not recover its attorneys'
fees and related expenses" given "LendingTree's blatant, willful
infringement."  (D.I. 272 at 13)

Plaintiff filed its motion for entry of a permanent injunction on January 30, 2006 - six days after the jury's verdict.  (D.I. 246, 260)  Plaintiff requested that the court order the defendant immediately enjoined from its further infringing use of the LendingTree Exchange system.  (D.I. 261 at 5-6)  In response, defendant argued that the entry of a permanent injunction at that time would be premature, insofar as:  (1) post-trial motions on the issues of infringement, invalidity, and inequitable conduct were pending and may have rendered IMX's motion for entry of an injunction moot; and (2) the Supreme Court had granted certiorari in eBay Inc. v. MercExchange, L.L.C., 126 S.Ct. 733 (Nov. 28, 2005) (hereinafter "eBay"), to address the question of when it is appropriate to grant an injunction against a patent infringer.  (D.I. 270 at 8-11)

The Supreme Court issued its decision in eBay on May 15, 2006, in which it overruled the Federal Circuit's longstanding "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." 126 S.Ct. 733 (2006) (vacating and remanding MercExchange, L.L.C. v. eBay Inc., 401 F.3d 1323, 1339 (2005)).  The Supreme Court held in eBay that courts should apply the traditional four-factor test used by courts of equity when considering whether to award permanent injunctive relief to a prevailing plaintiff in a patent infringement case.  126 S.Ct. at 1839.  A plaintiff must

41

demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. Further, "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id. at 1841.

The day of the eBay decision, defendant filed a citation of subsequent authority in support of its opposition to plaintiff's motion for entry of a permanent injunction in view of the Supreme Court's ruling. (D.I. 288) Defendant states that the eBay decision aids its opposition to entry of a permanent injunction as plaintiff relied heavily on the Federal Circuit's vacated decision in support of its motion. (Id. at 2) Plaintiff filed a response to defendant's citation of subsequent authority on May 17, 2006. (D.I. 289)

## 2. Discussion

Plaintiff asserts that "plaintiff did not rely heavily on the Federal Circuit's opinion in eBay." (D.I. 289 at 2, 3 ("As set forth in IMX's opening and reply briefs, the equitable

42

principles for granting a permanent injunction weigh heavily in IMX's favor")) Yet, outside of the now-overturned presumption that a patent holder is irreparably harmed upon a finding of infringement, plaintiff's papers contain little support for its argument that it will suffer irreparable harm. (D.I. 261 at 2-3; D.I. 274 at 3-6)

Plaintiff states that it is suffering irreparable harm as a result of defendant's continued infringement, insofar as the benefit of its exclusive rights under the '947 patent continue to be unjustly reduced. (D.I. 261 at 4) Further, plaintiff argues that if defendant is not permanently enjoined, "such willful infringement will continue unchecked, thereby diminishing IMX's exclusive rights in its intellectual property."[23] (Id. at 4-5) Plaintiff, however, put forward no evidence of irreparable harm

---

[23]Plaintiff cites to several recent statements by LendingTree executives in its briefing in support of the proposition that defendant intends to "increase" its infringing activities notwithstanding the jury's verdict. (D.I. 274 at 4) Plaintiff cites a statement that LendingTree has completed 50% more Qualification Forms for potential borrowers than in the same quarter a year ago. (D.I. 274, ex. A) Further, defendant has publicly stated that:

> This case will have no meaningful effect on how our lenders and customers interact with LendingTree. LendingTree will continue to provide the same level of quality service to both consumers and lenders. The fundamentals of our consumer protection will remain the same - consumers will continue to use the LendingTree marketplace to find lenders that will compete for their business.

(D.I. 261, ex. A) Though these statements appear to support plaintiff's argument insofar as defendant intends to maintain the status quo, they do not appear to support plaintiff's argument that defendant plans to "increase" its infringing activity.

43

1Case 1:03-cv-01067-SLR   Document 291   Filed 01/10/07   Page 45 of 52 PageID #: 4829

resulting from defendant's infringement, for example, market or financial data, to support its sweeping statements. See eBay, 126 S.Ct. at 1840 (infringing one's right to exclude, alone, is insufficient to warrant injunctive relief).

There is no dispute that plaintiff licensed its '947 patent on two occasions, one which stemmed from a settlement with a previously-named defendant in this action, Priceline.com. (D.I. 274 at 5 & fn. 3) There is no indication in the record that defendant's infringement affected plaintiff's ability to license the technology of the '947 patent. See Paice LLC v. Toyota Motor Corp., No. Civ. A. 04-211, 2006 WL 2385139, *4 (E.D. Tex. Aug. 16, 2006) (rejecting plaintiff's argument that it was irreparably harmed by defendant's infringement in the marketplace where "plaintiff's evidence . . . [did] not prove the current litigation or the absence of an injunction have resulted in its ability to successfully license its technology") (denying permanent injunction on multiple grounds). Plaintiff's willingness to forego its patent rights for compensation, though certainly not dispositive, is one factor to consider with respect to whether plaintiff will suffer irreparable harm.[24]  eBay, 126

---

[24]Plaintiff's licensing activities also suggest that plaintiff's injury would be compensable in damages. See High Tech Medical Instrumentation, 49 F.3d at 1557 (citing T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987) (licensing is "incompatible with the emphasis on the right to exclude that is the basis for the presumption in a proper case")). Plaintiff's arguments that High

S.Ct. at 1840 (rejecting categorical rule that patentee licensors can not demonstrate irreparable harm).

On the other hand, defendant's infringing use of plaintiff's technology is not limited to a minor component of the LendingTree Exchange; rather, the LendingTree Exchange primarily, if not completely, mimics the patented system. This factor is also considered in the evaluation of irreparable harm, and weighs in favor of an injunction. See z4 Technologies, Inc. v. Microsoft Corp., 434 F.Supp.2d 437, 440-41 (E.D. Tex. 2006) (no irreparable harm, and monetary damages more appropriate, where defendant used infringing technology "as a small component of its own software" and, thus, infringing use did not hinder or exclude plaintiff's sales or licensing of its product) (denying permanent injunction on multiple grounds).

Plaintiff argues that there is no significant public harm which would bar injunctive relief, as both its IMX Exchange system and the LendingTree Exchange are in public use. (D.I. 274 at 14; id. at 10 ("IMX's commercial embodiment of its invention . . . is provided directly to the public") (internal parentheses omitted)) According to defendant, however, plaintiff "does not provide its technology directly to the public." (D.I. 270 at 7)

---

Tech Medical Instrumentation is inapplicable, due to the lack of a presumption of irreparable harm in that case, are belied in light of the Supreme Court's subsequent decision in eBay. (D.I. 274 at 7-8)

Defendant argues that, if it is enjoined from providing its LendingTree Exchange service to customers, customers may be at a disadvantage in making informed decisions about home mortgages.[25] (D.I. 274 at 7)

It is unclear to the court whether plaintiff's product is available to and used by the same "public" as defendant's LendingTree Exchange.[26]  The court can not reasonably ascertain whether, and to what extent, the public would be disserved by a permanent injunction without additional information.

### 3.  Conclusion

Absent any specific information regarding the effect of defendant's infringing operation of the LendingTree Exchange on plaintiff's business, the court is reluctant to make a

---

[25]There is record evidence that defendant employs around 2000 employees, and that defendant's commercial success is derived from the LendingTree Exchange.  (D.I. 254 at 761:25-762:10)  The record also indicates that plaintiff is a small company, employing less than a dozen employees (in 2003).  (D.I. 251 at 179:24-180:7)  Plaintiff states that it is in poor financial condition, however, it does not argue that its condition will be worsened should an injunction not be issued.  (D.I. 261 at 8)  Although it appears that the balance of hardships may weigh against enjoining defendant's use of the LendingTree Exchange, the court declines to make this determination without additional information.

[26]Plaintiff's website indicates that the IMX Exchange is a communication forum for brokers and lenders, rather than customers and lenders (like the LendingTree Exchange).  See http://www.imxexchange.com; https://www.imx.com/corp/about_us.asp.  The potential implications of any such differences on public harm have not been argued by the parties.

46

determination based solely on the considerations present in the
current record. The '947 patent expires in 2017. The court
declines to effectively impose a ten-year compulsory license on
defendant absent more information, for example, the effects of
defendant's infringement on plaintiff's business and of a
potential permanent injunction on the public and the marketplace.

     It is true that it was, and remains, plaintiff's burden to
satisfy the four-factor test. Plaintiff did not take advantage
of its opportunity to amend its arguments following eBay in its
response to defendant's citation of subsequent authority, and did
not seek an additional opportunity from the court to do so
between May 15, 2006 and the date of this opinion. Nevertheless,
considering the timing of the eBay decision, and the court's
alternatives at this juncture, the court is inclined to give
plaintiff the opportunity to provide additional evidence which
will aid its determination of the issue. Compare Keg Techs.,
Inc. v. Laimer, 436 F.Supp.2d 1364, 1371 (N.D. Ga. 2006)
(declining to deny plaintiffs injunctive relief in favor of
taking additional evidence and argument where the Supreme Court's
eBay decision was issued on the day of the evidentiary hearing,
where plaintiffs "did not show, and indeed, had little if any
notice of the need to show, satisfaction of [two of the four]
elements" of the four-factor test). An appropriate order shall
issue.

                                47

### 6.  Adjustment of Damages

Plaintiff moves the court under Federal Rule of Civil Procedure 59(e) to amend the judgment in this case to award plaintiff damages for defendant's infringement subsequent to the judgment.  (D.I. 272 at 16-17)  The court reserves determination of this issue pending its determination of whether a permanent injunction is appropriate in this case.

### 7.  Prejudgment Interest

Plaintiff moves the court to amend the judgment to provide for prejudgment interest based on the average prime rate, compounded annually.  (D.I. 272 at 15)  Section 35 U.S.C. § 284 provides for the calculation of damages "together with interest . . . as fixed by the court."  Prejudgment interest should ordinarily be awarded absent some justification for withholding such an award.  See General Motors Corp. v. Devex Corp., 461 U.S. 648, 657 (1983).

Defendant asserts that prejudgment interest should be denied in this case because plaintiff unduly delayed bringing its infringement suit.[27]  (D.I. 276 at 26)  Defendant's cited authority, Crystal Semiconductor Corp. v. TriTech Mictoelectronics Intern., Inc., 246 F.3d 1336, 1362 (Fed. Cir. 2001), does not support defendant's proposition that prejudgment

---

[27]The '947 patent issued on November 30, 1999, and plaintiff filed the present suit on November 24, 2003.

48

interest should be denied based upon this delay.[28]  Further,
defendant cites no evidence or examples of the alleged prejudice
it suffered as the result of plaintiff's failure to bring suit
until November 2003.  (D.I. 276 at 26)  Bare allegations can not
suffice to counter to controlling authority stating that
prejudgment interest ordinarily should be awarded.  See IPPV
Enterprises, LLC. v. Echostar Communications Corp., No. Civ. A.
99-577, 2003 WL 723260, *3 (D. Del. Feb. 27, 2003) (citing
General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-57
(1983)).

     Defendant further argues that if prejudgment interest is
awarded, the U.S. Treasury Bill ("T-Bill") rate is most
appropriate.  (D.I. 276 at 27-28)  Defendant reasons that
plaintiff has not demonstrated that a higher interest rate is
necessary to compensate plaintiff for the economic loss caused by
infringement.  (Id. at 28)  Further, defendant cites to its
expert's opinion that the court should take into account that
plaintiff was not only deprived of the use of additional royalty
income it would have received; plaintiff was also relieved of the

---

     [28]In Crystal Semiconductor, defendant presented evidence
that plaintiff's delay in bringing suit was a litigation tactic:
plaintiff "sent letters to 30 or 40 companies in 1994-95
informing the companies of [its] patents.  However, [plaintiff]
did not send any such letter to TriTech or OPTi, even though
[plaintiff] had already determined that TriTech and OPTi were
infringing Crystal's patents."  Id.  No comparable evidence
exists in this case.

risks associated with investing that income. (Id.)

"[I]t is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991)(citation omitted). The court is satisfied that the appropriate prejudgment interest rate should be the Federal Reserve average prime rate, compounded annually, as set forth in the Declaration of Robert Wallace, plaintiff's accountant. (D.I. 266) Courts have recognized that the prime rate best compensate a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is "a better measure of the harm suffered as a result of the loss of the use of money over time." Mars, Inc. v. Conlux USA Corp., 818 F.Supp. 707, 720-21 (D. Del. 1993), aff'd, 16 F.3d 421 (Fed. Cir. 1993). Accordingly, the court shall order defendant to pay prejudgment interest, compounded quarterly, at the prime rate.

### 8. Post-Judgment Interest

Finally, plaintiff moves the court for post-judgment interest. (D.I. 272 at 15-16) Section 28 U.S.C. 1961(a) provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve

System, for the calendar week preceding."  Accordingly, the court shall order defendant to pay post-judgment interest at the applicable rate.  An appropriate order shall issue.